| | | |
|---|---|---|
| T-Mobile USA, Inc., a Delaware corporation, | ) ) ) | No. 12 C 10046 |
| Plaintiff, | ) ) ) | Judge Thomas M. Durkin |
| v. | ) ) | |
| AU Electronics, Inc. d/b/a A-U Electronics, Inc., an Illinois corporation; Global Mobile Trading, Inc. d/b/a AU Express Cash 4 Electronics d/b/a A-U Express d/b/a AU, Inc., an Illinois corporation; Umair Yasin, individually; and Adnan Vadria, individually, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff T-Mobile USA, Inc. ("T-Mobile") brings this action against defendants AU Electronics, Inc. ("AU"), Global Mobile Trading, Inc. ("GMT"), Umair Yasin ("Yasin"), and Adnan Vadria ("Vadria"), alleging that defendants are engaged in a pattern of unlawful business practices involving the bulk purchase and resale of T-Mobile cellular phones.[1] On August 20, 2013, the parties signed a settlement agreement which provides for a complete resolution of the lawsuit. R. 119. Defendants later notified the Court that they were repudiating the agreement, R. 116, which prompted a dispute between the parties over whether the agreement

---

[1] Sprint Nextel Corporation and Sprint Communications Company, L.P. sued the same defendants in *Sprint Nextel Corp., et al. v. AU Elecs., Inc., et al.*, No. 12 C 9095, which is also before this Court. The parties are represented by the same attorneys in both cases.

was enforceable. Presently before the Court are T-Mobile's motion to enforce the settlement agreement, R. 124, and defendants' motion to reform the settlement agreement to include an unintended omission, R. 143. For the reasons explained below, the Court grants defendants' motion to reform the settlement agreement, and further grants T-Mobile's motion to enforce the settlement agreement.

## Background

On December 18, 2012, T-Mobile filed a thirteen-count complaint alleging that defendants were "defraud[ing] and willfully infring[ing] upon T-Mobile's trademark and other rights" through an elaborate "Subsidy Theft and Activation Fraud Scheme." R. 1 ¶ 1. According to the complaint, defendants instigated the scheme by acquiring large quantities of phones from T-Mobile and its authorized retailers. *Id.* ¶ 3. Defendants then removed the phones from their original packaging and sold the phones' Subscriber Identity Module ("SIM") cards "for fraudulent activation on the T-Mobile network through the use of improperly acquired confidential codes that illegally access T-Mobile's computers." *Id.* With the SIM cards removed, defendants "ship[ped] the [p]hones overseas, unlocked or to be unlocked," to be sold for a substantial profit. *Id.* As a result of this alleged scheme, T-Mobile brought numerous claims under federal and state law, including violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. R. 1 ¶¶ 97, 128.

Due to the continuing nature of the alleged conduct, the Court ordered expedited discovery. R. 35. While discovery was ongoing, defendants filed two

motions to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). R. 37; R. 40. Then, during the week of August 12, 2013, counsel for T-Mobile took depositions of Vadria and Yasin at the offices of defendants' counsel. R. 124 at 2-3. At that point, the parties began discussing the possibility of settlement.[2] *Id.* at 3. Settlement discussions continued throughout the week, and on August 16, 2013, the parties reached an agreement. *Id.* The settlement agreement was memorialized in writing, and the parties exchanged notarized signature pages on August 20, 2013. *Id.* at 4.

The settlement agreement provides for a complete resolution of the lawsuit and includes provisions that are highly favorable to all parties. Section 9(A) of the agreement provides for entry of Final Judgment against defendants in the amount of $[redacted]. R. 119 at 6. T-Mobile is barred from executing on the Final Judgment, however, if defendants pay four installments of $[redacted], with each installment separated by several months:

> Defendants stipulate and agree that the amount of the Final Judgment entered in this Lawsuit in favor of T-Mobile and against Defendant AU Electronics, Inc. d/b/a A-U Electronics, Inc., shall be $[redacted] in the form attached hereto as Exhibit A to Exhibit 1. T-Mobile agrees not to execute on the Final Judgment provided Defendants (a) fully and timely comply with all of their

---

[2] Defendants contend that counsel for T-Mobile ambushed them with direct communications made outside the presence of their counsel. R. 116 ¶ 3. T-Mobile denies these allegations and instead claims that the parties discussed settlement with counsel present during breaks in the testimony. R. 124 at 3. Despite the conflicting versions of how the settlement process was initiated, there apparently is no question that the substantive discussions that followed were all with counsel present. There is no claim by defendants that the settlement agreement should not be enforced because of the manner in which the settlement discussions began.

> obligations under this Agreement and the Permanent
> Injunction; and (b) fully and timely make payment in the
> amount of $[redacted] to T-Mobile . . . in four equal
> installments of $[redacted] each, paid no later than
> January 31, 2014, May 1, 2014, August 1, 2014, December
> 29, 2014, respectively.

*Id.* In exchange, defendants are required to cease "any conduct related to . . . the Subsidy Theft and Activation Fraud Scheme [including] the purchase, sale, unlocking, reflashing, altering, advertising, soliciting, using, and/or shipping of any . . . wireless product sold by T-Mobile." Defendants are also prohibited from using third parties to engage in such conduct. *Id.* at 4.

At the center of this dispute is a provision that prohibits the parties from disclosing T-Mobile's forbearance in executing on the Final Judgment. Under Section 9(C) of the agreement:

> Any forbearance by T-Mobile in executing on the Final
> Judgment shall remain STRICTLY CONFIDENTIAL and
> [both T-Mobile and][3] Defendants are strictly prohibited
> from disclosing such forbearance or filing with the Court
> any document reflecting such forbearance under all
> circumstances except in defense of an action to enforce the
> terms of this Agreement. In that event, Defendant(s) may
> file a copy of this Agreement with the Court under seal,
> pursuant to the applicable Rules of Civil Procedure and
> the Local Rules of Court.

*Id.* The agreement also contains a provision that delayed filing of the stipulation for entry of Final Judgment and Permanent Injunction for 60 days, until October 21, 2013. R. 124 at 1. The purpose of this provision was to give defendants time to

---

[3] The bracketed text is added by the Court to include the language specified in defendants' motion to reform the settlement agreement. R. 143. For the reasons explained later in this opinion, defendants' motion is granted.

pursue claims against their insurers. *See* R. 124 at 1 n.1; R. 137 at 11. Specifically, Section 10 of the agreement provides that:

> No earlier than sixty (60) days from the full execution of this Agreement, or at another time of T-Mobile's choosing, T-Mobile will file a Stipulation for the entry of a Final Judgment and Permanent Injunction against Defendants in the Lawsuit in substantially the form attached hereto as Exhibit 1.

R. 119 at 7. As a result of these two provisions, the parties did not immediately inform the Court that they had executed a settlement agreement on August 20, 2013. To the Court's knowledge, defendants' motions to dismiss were still pending on that date and for some time thereafter.

On September 4, 2012, just two weeks after the settlement agreement had been signed, an undercover law enforcement agent attempted to sell Yasin five new cellular phones. R. 142 at 2. According to a report of the incident, Yasin refused to personally purchase the phones after learning that they were T-Mobile phones. R. 137, Exh. J. Instead, Yasin told the agent that he knew someone who would purchase the phones, and shortly thereafter, the agent received a call from a phone number which appeared on AU's business card. *Id.* The agent returned the call and arranged to sell the phones to an individual, later determined to be Sohaib Sakaria, at a gas station on the north side of Chicago. *Id.* Later that day, Sakaria arrived at the gas station on a motorcycle and bought the five T-Mobile phones from the agent in exchange for $700. *Id.* After the deal had concluded, a surveillance team stationed at AU's corporate offices observed Sakaria drive up on a motorcycle and enter the building. *Id.* The next evening, federal agents intercepted a package

bound for Hong Kong containing the same five T-Mobile phones that were sold to Sakaria. *Id.*

Defendants acknowledge this incident and claim that it was designed by law enforcement to test whether they were complying with the settlement agreement, which was still unknown to the Court at the time of these events. R. 137 at 7. Nevertheless, defendants fault the report for omitting "a few critical details." *Id.* For example, defendants claim that Sakaria came to AU and told its employees that the five phones were "factory unlocked," "which was consistent with the types of devices that . . . Sakaria had sold to AU in the past." *Id.* at 8. Defendants also point out that they were charged $500 per phone, which is consistent with the market price. *Id.* Additionally, defendants produced a draft invoice which shows that they marked the phones purchased from Sakaria not as T-Mobile phones, but rather as Verizon phones. *Id.* T-Mobile responds by asserting "defendants attempted to conceal their improper purchase and sale of the [phones] by creating a purchase order and invoice that [falsely] stated they were Verizon [phones]." R. 142 at 3.

On September 11, 2013, federal and state law enforcement agents executed search warrants at AU's offices for alleged violations of 18 U.S.C. §§ 1956(a)(2)(A) and (h) (money laundering), 2314 (transportation of stolen goods), and 2315 (sale or receipt of stolen goods). R. 124 at 4; R. 137 at 10. The agents seized all of defendants' inventory and records and placed a $9,999,999.00 lien against AU's bank account. R. 137 at 10.

On September 16, 2013, defendants filed a motion to advance a hearing or decision on the pending motions to dismiss, or in the alternative, for a summary judgment conference. *Sprint Nextel Corp., et al. v. AU Elecs., Inc., et al.*, No. 12 C 9095, R. 129.[4] In their motion, defendants advised the Court of the September 11, 2013 raid on AU's offices and accused T-Mobile of instigating it. *Id.* ¶¶ 1-2. Defendants then demanded a ruling on the pending motions to dismiss, noting that the Court had provided "no explanation for why [it] ha[d] chosen to delay in ruling." *Id.* ¶¶ 6, 15. In the alternative, defendants requested an in-chambers hearing to discuss a potential motion for summary judgment. *Id.* ¶ 16. Inexplicably, defendants made no mention of the fact that the parties had already signed a settlement agreement which had, at least on its face, completely resolved the lawsuit nearly four weeks earlier.

Defendants' September 16, 2013 motion to advance a hearing or decision prompted two filings later that day. First, T-Mobile filed a notice of settlement which, for the first time, informed the Court that "all parties to this case have reached a comprehensive settlement." R. 115 at 1. T-Mobile noted that the agreement contained a 60-day delay for filing the stipulation for entry of Final Judgment and Permanent Injunction but explained that it could not "wait any longer to inform the Court of the parties' settlement," given defendants' filing earlier that day that "request[ed] the Court to needlessly expend judicial resources

---

[4] Defendants filed this motion in the related *Sprint* litigation and incorporated it by reference into the present case. *See Sprint Nextel Corp., et al. v. AU Elecs., Inc., et al.*, No. 12 C 9095, R. 129 at 3 n.2.

on a case that has been settled in all respects." *Id.* at 2. Shortly thereafter, defendants informed the Court that they were repudiating the settlement agreement due to allegations that T-Mobile had caused or contributed to the governmental raid on AU's offices and T-Mobile's disclosure of "strictly confidential" terms of the settlement agreement by filing its notice of settlement. R. 116 ¶¶ 4, 7. In response, the Court held a telephonic status hearing on September 17, 2013. R. 120. The Court heard arguments from all parties and then instructed T-Mobile to submit a brief explaining why the settlement agreement should be enforced. *Id.* An accompanying briefing schedule on the issue was set. *Id.*

On September 19, 2013, defendants filed a motion for expedited discovery, asking the Court to compel T-Mobile to produce "any and all communications with government authorities regarding [d]efendants." R. 121 at 1. This request was based on defendants' allegation that T-Mobile had affirmatively represented during settlement negotiations that it "had [not] previously communicated or shared information with law enforcement[,] and to its knowledge, there was no active investigation of [d]efendants." *Id.* ¶ 8. Defendants asserted that they would be entitled to rescission and repudiation of the settlement agreement if it was shown that T-Mobile had committed fraud in making these statements. *Id.* ¶ 12.

The Court granted defendants' motion in part and ordered T-Mobile to provide affidavits from individuals who had contact with law enforcement personnel between August 16, 2013 and September 18, 2013. R. 125. The Court did not require disclosure of communications predating the settlement agreement, however,

due in part to an integration clause which provides that "[t]his Agreement expresses the entire agreement between the [p]arties with respect to the compromise of the claims described herein." R. 119 at 11.

In response to the discovery order, T-Mobile produced affidavits from Senior Corporate Counsel Marian Vetro, Senior Manager of Major Investigations Aran January, Illinois Division Loss Prevention Manager Marisol Martinez, and attorney James Baldinger, its counsel in this case. R. 126-129. Although these affidavits referenced several email communications with law enforcement, each affidavit maintained that during the relevant dates, T-Mobile's employees and agents had "not provided any information to law enforcement regarding [defendants] in this case, except in response to a request by a member of law enforcement." R. 126 ¶ 4; R. 127 ¶ 4; R. 128 ¶ 5; R. 129 ¶ 4. T-Mobile notes that such communications are expressly permitted by Section 17 of the settlement agreement, which provides that:

> T-Mobile shall not disclose Defendants' information beyond what is reasonably necessary to investigate and pursue claims of participation in the Subsidy Theft and Activation Fraud Scheme, or upon request by a member of law enforcement.

R. 119 at 11. The Court later expanded the discovery order and required T-Mobile to produce the emails referenced in the affidavits, which are discussed in greater depth below. R. 132. However, the Court again declined to allow discovery of materials which predate the settlement agreement. R. 136.

T-Mobile's motion to enforce the settlement agreement was fully briefed as of October 18, 2013. R. 124. On that date, defendants also moved to reform the

settlement agreement to include an unintended omission regarding whether T-Mobile is permitted to disclose its forbearance in executing on the Final Judgment. R. 143.

## Legal Standard

"A district court has the inherent or equitable power to enforce a settlement agreement in a case before it." *Hyde Park Union Church v. Curry*, 942 F. Supp. 360, 363 (N.D. Ill. 1996) (citing *Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir. 1995)). It is well-established that a settlement agreement is a contract, *Herrnreiter v. Chicago Hous. Auth.*, 281 F.3d 634, 636 (7th Cir. 2002), and therefore federal courts look to state contract law to decide issues regarding the formation, construction, and enforcement of the agreement, *Magallanes v. Ill. Bell Tel. Co.*, 535 F.3d 582, 584 (7th Cir. 2008). In interpreting a settlement agreement under Illinois law, "'the paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement.'" *Laserage Tech. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (quoting *Int'l Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.*, 168 Ill. App. 3d 361, 370 (1st Dist. 1988)). Illinois follows the objective theory of intent, meaning that the terms of the agreement depend on "what the parties express to each other and to the world, not on what they keep to themselves." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir. 1992).

## Analysis

The issue before the Court is whether the settlement agreement that the parties signed on August 20, 2013 is enforceable. As mentioned above, defendants

have filed a notice of repudiation in which they completely disavow the validity of the agreement. R. 116. Defendants maintain that the Court should decline to enforce the agreement because: (1) T-Mobile fraudulently induced them to enter into the agreement; (2) T-Mobile breached the express terms of the agreement; and (3) equitable considerations prevent the agreement from being enforced. R. 137. The Court addresses these arguments in turn.

## I.  The Parties Entered into a Valid and Enforceable Settlement Agreement.

The Court's first task is to determine whether the parties entered into a valid and enforceable settlement agreement. *See Wilson*, 46 F.3d at 666. Under Illinois law, an agreement is binding and enforceable when there has been "an offer, an acceptance, and a meeting of the minds as to all material terms." *Seko Worldwide, LLC v. Four Soft Ltd.*, 503 F. Supp. 2d 1059, 1060 (N.D. Ill. 2007); *see also Pritchett Asbestos Claims Mgmt. Corp.*, 332 Ill. App. 3d 890, 896 (5th Dist. 2002). Whether there was a "meeting of the minds" is determined by the parties' objective manifestations of intent, not their secret hopes or wishes. *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999). The agreement must also be sufficiently definite with respect to its material terms. *Seko Worldwide, LLC*, 503 F. Supp. 2d at 1061. "A contract is sufficiently definite with respect to its material terms and certain to be enforceable if the court is enabled from the terms and provisions thereof to ascertain what the parties have agreed to do." *Pritchett*, 332 Ill. App. 3d at 896.

The parties here signed the settlement agreement and exchanged notarized signature pages, which indicates that they accepted the terms of the agreement. *See, e.g.*, *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 985 (1st Dist. 1997) ("[W]here [defendant] signed the agreement in his own name and tendered it to [plaintiffs], there is no reason in law or logic why he should not be individually bound by its terms."). Furthermore, the agreement itself contains numerous provisions which cautioned the parties that they were entering into a binding agreement to settle the case. For example, the parties expressly signified their understanding that "the agreement is a legally enforceable contract that affects [their] rights, duties, and obligations." R. 119 at 12. The agreement also encouraged the parties to retain and consult with counsel before consenting to its terms—indeed, counsel for both T-Mobile and defendants were present at the settlement negotiations, and the parties "frequently left the room to engage in private discussions with their counsel." R. 124 at 3. Moreover, defendants' counsel himself "printed several drafts of a proposed agreement, which were marked up and modified as [the attorneys] negotiated each and every provision." *Id.*

The parties also reached a "meeting of the minds" as to all material terms of the settlement agreement. A material term is an essential provision of a contract that "is of such nature and importance that the contract would not have been made without it." *Haisma v. Edgar*, 218 Ill. App. 3d 78, 86 (1st Dist. 1991). In the opening recitals of the agreement, the parties express their "desire to resolve all claims among and between them in any way arising out of Defendants' participation in the

Subsidy Theft and Activation Fraud Scheme as alleged." R. 119 at 3. Accordingly, the agreement provides for a complete resolution of this lawsuit by entry of Final Judgment against defendants in the amount of $[redacted]. *Id.* at 7. The agreement prohibits T-Mobile from executing on the Final Judgment, however, if defendants pay four installments of $[redacted], each separated by a period of several months. *Id.* This amounts to a total of $[redacted], or [redacted]% of the Final Judgment. In return, defendants are required to cease all conduct related to the Subsidy Theft and Activation Fraud Scheme. *Id.* at 4. These are the material terms of the agreement, without which settlement would not have been reached. Because the parties agreed on these terms, the Court finds that the parties entered into a valid and enforceable settlement agreement and that they are bound by its terms.

Without much elaboration, defendants argue that the settlement agreement is not valid due to a "substantial failure of consideration." R. 137 at 18. Consideration is a common law contract principle defined as "a bargained-for exchange whereby the promisor receives some benefit or the promisee suffers some detriment." *LKQ Corp. v. Thrasher*, 785 F. Supp. 2d 737, 742 (N.D. Ill. 2011). Under common law, "consideration is relatively easy to show": as long as a person receives something of value in exchange for his own promise or detriment, consideration is adequate. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996).

Here, defendants cannot seriously contend that consideration does not exist because a plain reading of the settlement agreement reveals a distinct "bargained for exchange," i.e., the release of the claims set forth in the lawsuit in exchange for

monetary payment. *See Majkowski v. Am. Int'l Group, Inc.*, No. 08 C 4842, 2008 WL 5272193, at *3 (N.D. Ill. Dec. 16, 2008) (explaining that a $125,000 payment from defendant in exchange for a discharge of plaintiff's claims constituted adequate consideration). Moreover, the language of the agreement itself provides that adequate consideration was obtained: "for and in consideration of the mutual promises and covenants herein contained, the receipt and sufficiency of which is acknowledged by [the parties, the parties] agree as follows." R. 119 at 3. In the simplest of terms, defendants faced a serious lawsuit where [redacted] in damages were potentially at issue. They effectively settled the lawsuit for $[redacted]. This is sufficient consideration.[5]

Because the parties engaged in a "meeting of the minds" as to all material terms, the Court finds that the parties entered into a valid and enforceable settlement agreement. Consequently, the parties are bound by its terms and provisions.

---

[5] The Court notes that that neither the 60-day delay for filing the stipulation for entry of Final Judgment and Permanent Injunction, nor the provision calling for defendants to make installment payments, renders the settlement agreement conditional or unenforceable. "An agreement to settle . . . is effective when arrived at unless the parties have subjected its effectiveness to contingencies," *Lampe v. O'Toole*, 292 Ill. App. 3d 144, 148 (2d Dist. 1997), and here, there is nothing that would have prevented T-Mobile from filing the stipulation after 60 days. Further, it is well-established that a requirement of future payment does not render a settlement agreement invalid. *See, e.g., Pinnacle Performance Inc. v. Garbis*, No. 12 C 1136, 2013 WL 655202, at *4-*5 (N.D. Ill. Feb. 21, 2013).

## II. The Court Reforms the Settlement Agreement to Include an Unintended Omission.

Section 9(C) of the settlement agreement contains a provision that prohibits defendants from disclosing T-Mobile's forbearance in executing on the Final Judgment:

> Any forbearance by T-Mobile in executing on the Final Judgment shall remain STRICTLY CONFIDENTIAL and Defendants are strictly prohibited from disclosing forbearance or filing with the Court any document reflecting such forbearance under all circumstances except in defense of an action to enforce the terms of this Agreement. In that event, Defendant(s) may file a copy of this Agreement with the Court under seal, pursuant to the applicable Rules of Civil Procedure and the Local Rules of Court.

R. 119 at 7. Defendants have moved to reform this provision to include an inadvertent omission. R. 143. Specifically, defendants claim that the parties specifically agreed that Section 9(C) should prevent both defendants *and* T-Mobile from disclosing the terms of the forbearance. *Id.* ¶ 10. However, due to the "lengthy settlement negotiations and drafting sessions lasting until 11:00 p.m. that night," defendants believe that T-Mobile erroneously omitted this revision. *Id.*

Reformation is appropriate when "the parties [have] reached an agreement but, in reducing it to writing, some provision agreed upon was omitted . . . through mutual mistake." *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 197 (7th Cir. 1992). Reformation changes the contract so that it properly reflects the agreement originally reached by the parties, provided that "both the mistake and an actual agreement other than that expressed in writing" are shown. *Id.* At the

October 23, 2013 motion hearing, T-Mobile declared that the omission was likely a scrivener's error, and in its written response, T-Mobile states that it does not object to defendants' request to reform the agreement. R. 147 at 1. As a result, the Court grants defendants' motion to reform the settlement agreement. Section 9(C) of the settlement agreement is therefore reformed to read:

> Any forbearance by T-Mobile in executing on the Final Judgment shall remain STRICTLY CONFIDENTIAL and *both T-Mobile and* Defendants are strictly prohibited from disclosing forbearance or filing with the Court any document reflecting such forbearance under all circumstances except in defense of an action to enforce the terms of this Agreement. In that event, Defendant(s) may file a copy of this Agreement with the Court under seal, pursuant to the applicable Rules of Civil Procedure and the Local Rules of Court.

*Accord* R. 143 at ¶ 8 (emphasis added).

In light of this result, T-Mobile argues that defendants are judicially estopped from contesting the validity of the settlement agreement. Judicial estoppel is an equitable doctrine that "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). T-Mobile points out that reformation requires the existence of an actual agreement between the parties. R. 147 at 1. As a consequence of prevailing on their motion to reform, T-Mobile argues that defendants, in turn, "are judicially estopped from taking a contrary position in this litigation, and their challenges to the validity of the [s]ettlement [a]greement must fail as a matter of law." *Id.* at 1-2. The Court disagrees.

Judicial estoppel is an equitable doctrine that is concerned with fairness to the parties. *Matter of Cassidy*, 892 F.2d 637, 642 (7th Cir. 1990). In this case, it would be exceedingly unfair for defendants to lose their ability to contest the settlement agreement by pointing out an error made in drafting the agreement. Further, the Supreme Court has instructed courts to consider prejudice to the opposing party in deciding whether judicial estoppel has occurred. *New Hampshire*, 532 U.S. at 749. Here, T-Mobile has expressly stated that reforming the settlement agreement as defendants suggest would have no bearing on its validity, R. 147 at 1, and therefore the Court is unable to see how T-Mobile would suffer any prejudice through defendants' seemingly-inconsistent positions. Accordingly, defendants are not judicially estopped from contesting the settlement agreement.

## III.   Defendants Were Not Fraudulently Induced to Enter into the Settlement Agreement.

Defendants argue that they are entitled to rescind the settlement agreement because T-Mobile fraudulently induced them to enter into the agreement. R. 137 at 11-15. Defendants claim that, during settlement negotiations, counsel for T-Mobile (1) denied knowledge about any pending law enforcement investigations of defendants; and (2) denied knowledge of any communications between T-Mobile and law enforcement regarding defendants. *Id.* at 3-4. According to defendants, they reasonably relied on these representations in entering into the settlement agreement. *Id.* They also contend, based on the discovery that the Court permitted, that T-Mobile knowingly misled them by making these statements. *Id.* at 14.

Under Illinois law, a party who is fraudulently induced to enter into a contract is entitled to rescind that contract. *See 23-25 Bldg. P'ship v. Testa Produce, Inc.*, 381 Ill. App. 3d 751, 758 (1st Dist. 2008). A claim for fraudulent inducement requires proof of five elements: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003). In addition, the party alleging fraudulent inducement must establish that his belief in, and reliance on, the statement was reasonable. *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1207 (7th Cir. 1998). Proof of each element of fraudulent inducement must be shown by clear and convincing evidence. *Nat'l Republic Bank of Chicago v. Nat'l Homes Constr. Corp.*, 63 Ill. App. 3d 920, 924 (1st Dist. 1978).

For purposes of this opinion, the Court presumes, without deciding, that counsel for T-Mobile made the representations alleged by defendants. In an email disclosed pursuant to the Court's discovery order, T-Mobile's Illinois Division Loss Prevention Manager wrote to Detective Sergeant Jim Hennelly of the Cook County Sheriff's Department:

> I am having the Director of Major Investigations and Fraud and possibly one of our Legal reps flying [sic] in next [w]eek. I was made aware there was a meeting Tuesday at noon, over on Madison. *I would like to have them join us as they will have relevant info for you and group in regards to AU.* Our analyst, Michelle has also gotten back to me and stated that the IMEI's and SIM cards ran, all came from credit mewling [sic]. She also

> stated some of the other IMEI's ran are from Wal Mart
> also, fraud via credit mewling [sic].

R. 137, Exh. B (emphasis added). Although this email was dated August 20, 2013, the date the settlement agreement was signed, the subject line of the email reads, "RE: Radio Shack robbery 27 June 13." *Id.* Thus, the reference to AU indicates that T-Mobile likely communicated with law enforcement regarding defendants prior to the effective date of the settlement, perhaps as early as June 27, 2013. Further, the email shows that T-Mobile was likely aware that law enforcement was interested in investigating defendants at that time. Nevertheless, defendants' fraudulent inducement claim fails for several reasons.

First, defendants have not shown that the statements were known or believed to be false by the person making them. According to defendants, the statements regarding T-Mobile's interaction with law enforcement were made during settlement negotiations by Jim Baldinger, counsel for T-Mobile. However, there is nothing in the record that suggests that Baldinger knew or believed these representations to be false at the time he made them. To be sure, several employees in T-Mobile's loss prevention and investigations divisions communicated with law enforcement at or near the time the settlement agreement was reached. These communications suggest that T-Mobile was at least aware of the possibility that law enforcement was interested in investigating defendants at that time. However, none of these employees were present during settlement negotiations, and knowledge of their communications, without more, cannot be imputed to Baldinger. Defendants point to no evidence suggesting that Baldinger was clued into the investigation

prior to the effective date of the settlement. Further, Baldinger affirmatively states in his affidavit that he did not become aware of the investigation until August 27, 2013, when he was informed that two Assistant United States Attorneys wished to speak with him regarding defendants. R. 126 ¶ 5. Defendants' claims to the contrary are unsupported.

Second, defendants have not demonstrated that they acted in reasonable reliance upon the statements allegedly made by T-Mobile's counsel. The settlement agreement identifies the specific facts that the parties relied upon in entering into the agreement. Notably, Section 11 states that "[t]he [p]arties expressly acknowledge and agree that neither T-Mobile nor its counsel presented, participated in presenting or threatened to present criminal charges against any [d]efendant to obtain an advantage in this lawsuit." R. 119 at 7. This clause was arguably included to satisfy the ethical rule preventing attorneys from engaging in such conduct. The agreement contains no representation, however, regarding the status of any investigation of defendants by governmental authorities. Further, Section 18 of the agreement contains an integration clause stating that the written agreement "expresses the entire agreement between the [p]arties with respect to the compromise of the claims described herein." *Id.* at 11. It, therefore, would not have been reasonable for defendants to rely upon the statements that T-Mobile's counsel allegedly made, and defendants have not provided clear and convincing evidence to the contrary.

Third, defendants have not alleged any damage resulting from their reliance on the statements by T-Mobile's counsel. The settlement agreement states that defendants are required to pay $[redacted], in four equal installments of $[redacted] each, beginning on January 31, 2014. R. 119 at 6. Defendants assert that they have been damaged because the government has frozen AU's funds and placed a $10 million lien on its bank accounts, and therefore they will default on the agreement and become immediately liable for the $[redacted] Final Judgment. R. 137 at 19. In support of this argument, defendants submit a declaration from Vadria stating that "it is impossible for AU to cause any payments to be made out of [its] bank account." *Id.*, Exh. A at ¶ 12.

Defendants' argument is untenable. Here, the only bank accounts that have been frozen are AU's corporate accounts. The bank accounts of the individual defendants, Yasin and Vadria, have not been frozen, and defendants have made no showing that they will be unable to satisfy the monetary commitments of the agreement by using their personal assets. In addition, they agreed that they would make the payments at the time the agreement was signed. They agreed to an extended payment plan and bore the risk that at some point in the future they may be unable to make the payments. As with any agreement, the failure of a party to fulfill its side of the bargain does not give it the ability to walk away from the agreement. The party simply has to live with the consequences of the breach. Therefore, defendants have not established any tangible harm, and their argument that they cannot make payments is without adequate support. The only other

plausible consequence to defendants is their inability to misrepresent the state of the case to the Court and their insurers, which is something they should not do in the first place. Accordingly, their argument regarding damage fails.

Finally, and perhaps most significantly, defendants are not entitled to rescission for fraudulent inducement because they themselves breached the terms of the settlement agreement. Rescission is an equitable remedy, and its application is largely left to the discretion of the trial judge. *See Nigrelli v. Catholic Bishop of Chicago*, 68 F.3d 477, 477 (7th Cir. 1995). The doctrine of "unclean hands" prohibits rescission, however, when the party seeking to rescind the agreement has engaged in misbehavior related to the transaction at issue himself. *See Zahl v. Krupa*, 365 Ill. App. 3d 653, 658 (2d Dist. 2006). The rationale of this doctrine is to prevent "one seeking equity from taking advantage of his own wrong." *La Salle Nat'l Bank v. 53rd-Ellis Currency Exch., Inc.*, 249 Ill. App. 3d 415, 437 (1st Dist. 1993). "In looking at whether unclean hands are present, the court will look to the intent of the party, not the effect of its actions, and will only find unclean hands if there has been fraud or bad faith." *Jaffe Commercial Fin. Co. v. Harris*, 119 Ill. App. 3d 136, 140 (1st Dist. 1983); *see also Thompson Learning, Inc. v. Olympia Props., LLC*, 365 Ill. App. 3d 621, 634 (2d Dist. 2006).

Here, there is enough evidence in the record to demonstrate that defendants have breached the terms of the settlement agreement. As explained above, the settlement agreement prohibits defendants from engaging in any conduct related to the Subsidy Theft and Activation Fraud Scheme, including "the purchase, sale,

unlocking, reflashing, altering, advertising, soliciting, using, and/or shipping of any . . . wireless product sold by T-Mobile." R. 119 at 4. Defendants are further prohibited from using third parties to engage in such conduct. *Id.*

On September 4, 2013, an undercover law enforcement agent attempted to sell five new phones to Yasin at AU's corporate offices. R. 137 at 7. Yasin refused to purchase the phones after learning that they were T-Mobile phones, presumably out of fear that he might be discovered circumventing the terms of the agreement. Instead, Yasin directed the agent to Sakaria, obviously in an effort to stay under the radar and not appear to be directly involved in a prohibited transaction. The report of the incident reveals that the telephone number provided for Sakaria matched a telephone number appearing on AU's business cards. Even more telling, however, is the fact that after Sakaria purchased the phones from the agent, he immediately drove to the AU's corporate offices and entered the same building where Yasin had met with the agent hours earlier. Defendants admit that they eventually obtained those phones, and later that evening, the phones were shipped by defendants to Hong Kong.

Defendants attempt to provide several innocuous explanations regarding this incident, but none of them are able to surmount the significant evidence against them. For example, Vadria claims that he was unable to determine whether the phones were T-Mobile phones because they were received in sealed packages and because of the manner in which the model number and serial number is designated on the outside of the package. R. 137, Exh. A. However, in his deposition testimony,

Vadria testified that AU employees open every phone box they purchase in order to ensure that they are purchasing and selling the specific type of phone requested by their customers. In the end, the evidence shows that defendants knowingly violated the settlement agreement by utilizing a third party to purchase T-Mobile phones, and therefore the doctrine of "unclean hands" prevents them from rescinding the agreement.

Defendants fault the Court for setting an "accelerated briefing schedule" and "openly admitting that it was limiting [their] rights to discovery because it was employing a summary procedure to determine whether or not to enforce the instant [s]ettlement [a]greement." R. 137 at 11. According to defendants, a decision to enforce the agreement "absent affording [d]efendants their rights to full discovery and a full evidentiary hearing would prejudice their legally protected rights and amount to an abuse of discretion." *Id.* at 12. In support of their argument, defendants cite an opinion issued by the D.C. Circuit in the late 1960s which stands for the proposition that a summary procedure is ill-suited to situations presenting complex factual issues. *Id.* (citing *Autera v. Robinson*, 419 F.2d 1197, 1200 (D.C. Cir. 1969)). *Autera*, however, involved an oral settlement agreement involving numerous complex issues of fact. Its holding is not applicable to this case.

Here, the Court has afforded defendants adequate discovery to explore their claims. The parties were given ample opportunity to brief their arguments, and the Court heard oral argument on many of the issues during several motion hearings. R. 125, 132, 136, 146. These procedures are by no means summary in nature, and

the Court does not find it necessary to order an evidentiary hearing at this stage in the proceeding. Evidentiary hearings are only necessary to resolve disputed issues of material fact, none of which are presented here. *See EEOC v. Bay Shipbuilding Corp.*, 668 F.2d 304, 309-10 (7th Cir. 1981); Fed. R. Civ. P. 78 ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). Furthermore, as explained below, any additional evidence that defendants expect to obtain would ultimately be unhelpful, as defendants themselves breached the terms of the settlement agreement before seeking rescission.

Defendants have not satisfied their burden of providing clear and convincing evidence to support each of the elements of fraudulent inducement. Therefore, they cannot rescind the settlement agreement on that ground.

## IV. T-Mobile Did Not Breach the Express Terms of the Settlement Agreement.

Defendants next maintain that they are entitled to rescind the settlement agreement because T-Mobile breached the express terms of the agreement by: (1) disclosing information about defendants to law enforcement; and (2) filing its notice of settlement which disclosed forbearance terms. R. 137 at 15-18. Under a plain reading of the terms of the agreement, these arguments fail.

### A. T-Mobile's Disclosures to Law Enforcement

Section 17 of the settlement agreement provides that "T-Mobile may use any information provided by [d]efendants to investigate and pursue claims against others." R. 119 at 10. The agreement further states that "T-Mobile shall not disclose

[d]efendants' information beyond what is reasonably necessary to investigate and pursue claims of participation in the Subsidy Theft and Activation Fraud Scheme, or upon request by a member of law enforcement." *Id.* at 11. These are the only limitations placed on T-Mobile with respect to defendants' "information."

T-Mobile undoubtedly provided law enforcement with information regarding defendants after the settlement agreement became effective; however, none of its disclosures violated the terms of the agreement. On the contrary, the documents produced to defendants demonstrate that T-Mobile carefully adhered to the agreement's conditions governing disclosure to law enforcement. For example, T-Mobile's Senior Manager of Major Investigations explained to law enforcement by email that "any release of materials/etc. related to this matter need[s] to be run by [T-Mobile's counsel] in order [to] ensure [T-Mobile] is staying within the guidelines of settlement." R. 137, Exh. D. Furthermore, sworn affidavits from employees in T-Mobile's loss prevention and investigations departments maintained that they had "not provided any information to law enforcement regarding [defendants] in this case, except in response to a request by a member of law enforcement." R. 126 ¶ 4; R. 127 ¶ 4; R. 128 ¶ 5; R. 129 ¶ 4.

Defendants fail to identify any information that T-Mobile shared with law enforcement in violation Section 17 of the settlement agreement. Instead, defendants concede, as they must, that "it is possible that every bit of information provided by T-Mobile representatives to law enforcement was entirely responsive to direct requests by law enforcement." R. 137 at 17. Furthermore, defendants' brief is

rife with speculation regarding T-Mobile's disclosures, frequently stating that T-Mobile "appeared" or "seemed" to violate the settlement agreement. Without more specific evidence, the Court finds that T-Mobile did not breach Section 17 of the agreement.

In any event, even if T-Mobile had breached Section 17 of the settlement agreement, such a breach would not entitle defendants to rescission of the agreement because it would not constitute a material breach. Illinois courts have stated that rescission is only appropriate where a "fundamental or material" breach "defeat[s] the purpose of the settlement agreement or . . . render[s] it unattainable." *Solar v. Weinberg*, 274 Ill. App. 3d 726, 734 (1st Dist. 1995). The Court listed the material terms of the agreement in Section I above, which include, among other things, payment by defendants in exchange for a complete resolution of the lawsuit. The provision of the agreement regarding disclosure of defendants' information was not a material term; in other words, it was not of such importance that the settlement agreement would not have been reached without it. *See Haisma*, 218 Ill. App. 3d at 86 ("In order to determine whether a failure of performance constitutes a material breach permitting rescission of the contract, a court must ask whether the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it."). As a result, any breach of Section 17 would not entitle defendants to rescission.

## B. T-Mobile's Notice of Settlement

Defendants also contend that T-Mobile breached the terms of the settlement agreement by filing its notice of settlement on September 16, 2013. The Court disagrees. As mentioned above, Section 9(C) provides that "[a]ny forbearance by T-Mobile in executing on the Final Judgment shall remain STRICTLY CONFIDENTIAL and both T-Mobile and Defendants are strictly prohibited from disclosing forbearance or filing with the Court any document reflecting such forbearance . . . ." R. 119 at 7. This language refers to T-Mobile's *forbearance in executing* on the Final Judgment, i.e., not pursuing collection of the $[redacted] Final Judgment and instead accepting $[redacted]. Under Illinois law, "the paramount objective [in interpreting a settlement agreement] is to give effect to the intent of the parties as expressed by the terms of the agreement." *Laserage Tech. Corp.*, 972 F.2d at 799. Here, there is nothing in the agreement which prohibits T-Mobile from informing the Court of the *fact* of settlement. And that is exactly what T-Mobile did. T-Mobile's notice of settlement informed the Court that "all parties to this case have reached a comprehensive settlement, which provides, among other things, for the case to be resolved by entry of a Final Judgment and Permanent Injunction." R. 115 at 1. The notice further refers to the 60-day delay in filing the stipulation for entry of the Final Judgment and Permanent Injunction. *Id.* What the notice does *not* do, however, is inform the Court that T-Mobile would forego executing on the Final Judgment in exchange for four payments of $[redacted] each. Such a disclosure would be expressly prohibited by Section 9(C). Accordingly,

because T-Mobile merely informed the Court of the fact that a settlement had been reached, it did not breach this provision of the agreement.[6]

## V. Equitable Considerations Do Not Prevent Enforcement of the Settlement Agreement.

Finally, defendants argue that the doctrine of commercial frustration precludes enforcement of the settlement agreement. R. 137 at 18-20. According to defendants, the primary object of the settlement agreement was the forbearance agreement by which T-Mobile agreed that it would not collect the $[redacted] Final Judgment in exchange for $[redacted]. *Id.* at 19. However, due to the government's execution of the search warrant and pending criminal investigation, defendants maintain that they do not have any money to pay the $[redacted] forbearance and, thus, are facing the prospect of defaulting on the settlement agreement. *Id.* As a result, defendants contend that the agreement is defeated by commercial frustration of purpose. *Id.* at 18-20.

"The commercial frustration defense is not to be applied liberally and is only appropriate if a rigorous two-part test is satisfied." *Blue Cross Blue Shield of Tenn.*, 517 F. Supp. 2d at 1059. To satisfy that difficult test, a party must demonstrate that: "(1) the frustrating event was not reasonably foreseeable; and (2) the value of counterperformance has been totally or nearly totally lost or destroyed by the frustrating event." *Id.* Defendants cannot meet this demanding test.

---

[6] For the reasons explained in Section IV-A of this opinion, the Court finds that even if T-Mobile had breached this provision of the settlement agreement, such a breach would not entitle defendants to rescind the agreement.

First, the governmental raid on AU's corporate offices was not unanticipated or unforeseeable. Defendants have conceded that it is public knowledge that companies engaged in the trafficking of phones have been raided by the federal government. *Sprint Nextel Corp., et al. v. AU Elecs., Inc., et al.*, No. 12 C 9095, R. 129 at 2 n.1. In fact, defendants had this concern in mind when they asked counsel for T-Mobile during settlement negotiations if he was aware of any pending investigations against them. R. 137 at 3. Regardless of how T-Mobile's counsel answered the question, defendants knew or should have known that T-Mobile did not have the ability to control or bind law enforcement with respect to a potential raid. Defendants cannot turn a blind eye to a known risk. *See AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990). Moreover, defendants' participation in a scheme to purchase T-Mobile phones through an intermediary and send them to Hong Kong put them at increased risk of being the subject of law enforcement scrutiny.

Second, as described above, the only bank accounts that have been frozen by the government are AU's corporate accounts. The bank accounts of the individual defendants, Yasin and Vadria, have not been frozen, and defendants have made no showing that they will be unable to satisfy the monetary commitments of the agreement by using their personal assets. Accordingly, the value of their counterperformance has not been destroyed, and the doctrine of commercial frustration does not bar enforcement of the settlement agreement.

**VI.    T-Mobile is Not Entitled to Recover Fees and Costs Associated with Defendants' Attempt to Repudiate the Settlement Agreement.**

As a final matter, T-Mobile asserts that defendants and their counsel "should be ordered to reimburse T-Mobile for the fees and costs associated with having to address Defendants' improper attempt to repudiate the Agreement." R. 124 at 14. "In order to impose sanctions pursuant to its inherent power, a court must find that the party acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 386 (7th Cir. 2008). Further, a court has discretion to impose sanctions under 28 U.S.C. § 1927 "when an attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice; pursued a claim that is without a plausible legal or factual basis and lacking in justification; or pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." *Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006) (internal quotations and citations omitted).

The Court declines to impose sanctions on defendants and their counsel for attempting to repudiate the settlement agreement. It is a close question. The Court was not pleased to learn for the first time on September 16, 2013 that the case had settled and a settlement agreement had been signed several weeks earlier. Significant pending motions to dismiss on this case were being reviewed during this period, and time was spent on this case that could have been expended on other pending cases. Defendants' "request" that the Court expedite its ruling on the motions to dismiss, without informing the Court that a settlement agreement was

signed several weeks earlier, can charitably be described as disingenuous. In the end, however, the Court does not agree with T-Mobile's argument that defendants had absolutely no legal or factual basis to invalidate the agreement, and therefore the Court declines to award fees and costs to T-Mobile.

## Conclusion

For the reasons explained above, the Court grants defendants' motion to reform the settlement agreement and reforms the language of the agreement as specified therein. R. 143. The Court further grants the relief requested in T-Mobile's motion to enforce the settlement agreement and finds that defendants' notice of repudiation is without force or effect. R. 124. In light of the Court's enforcement of the settlement agreement, defendants' motions to dismiss are denied as moot. R. 37; R. 40. Simultaneously with the entry of this opinion, the Court will enter a signed stipulated order of dismissal. This case is therefore dismissed with prejudice.

The Court would add that T-Mobile's motion to enforce the settlement agreement has been fully briefed since October 18, 2013, and through no fault of the parties, the motion has been pending since then. If defendants are unable to make their first payment on January 31, 2014 as required by the settlement agreement, the Court encourages, but of course does not require, the parties to enter into a codicil which extends the due date of this first payment for a short period of time.[7]

---

[7] The Court notes that the January 31, 2014 date has been known to defendants since August 20, 2013.

ENTERED:

Thomas M. Durkin
United States District Judge

Dated: January 23, 2014